**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **United States of America** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 1:26-CR-00093-DKC** |
| | : | |
| **Kanye Green** | : | |
| | : | |
| **Defendant** | : | |

**Motion to Suppress and Request for an Evidentiary Hearing**

Defendant Kanye Green moves to suppress the fruits of a search that followed the seizure of his person without reasonable suspicion.[1] In support of this motion, he shows as follows:

**Background**

The government has charged Mr. Green in a three-count indictment, alleging possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(8) (Count One), possession with intent to distribute controlled substances in violation of 18 U.S.C. § 841(a)(1) (Count Two), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i)(Count Three). *See* ECF No. 1.

On October 28, 2025, Mr. Green was standing at the 5100 Block of Park Heights Street, Baltimore, Maryland. An officer who was driving by in an unmarked patrol car stopped, exited his vehicle, and approached him. *See*

[1] Undersigned counsel reserves the right to also argue that Mr. Green's statements merit suppression. He was not *Mirandized* during the encounter with law enforcement.

5100_Park_Heights_HGV.mp4 at 1:00 (Exhibit "A").[2] He walked towards Mr. Green at an accelerated pace and said, "everything is being audio recorded, do you have a gun on you bro?" *Id*. at 1:10. Mr. Green looked at the officer and asked "gun?" before then lifting his jacket and showing officers his undershirt—which was tucked into his underwear. *Id*. at 1:13. Seeing no gun, the officer responded "bro, you don't gotta do all that, I'm talking about inside the jacket. *Id*. at 1:15. As the officer spoke to Mr. Green, at least two police cars pulled up on each side of Mr. Green—blocking him on the sidewalk. *Id*. at 1:16.

Mr. Green unzipped his jacket and indicated that he had some weed on him. *Id*. at 1:18. As he did so, a second officer with a tactical vest approached him. *Id*. at 1:30. He started walking around Mr. Green while the first officed asked "how much weed do you got on you?" *Id*. at 1:28. Mr. Green reached into his jacket and pulled out a prepacked bag of marihuana. *Id*. at 1:31.

At this point, Mr. Green was surrounded to his right side by a police officer, in front by another officer, and on his back by a marked police vehicle. *Id*. at 1:38. Mr. Green protested "Bro, I just showed this n*** my whole coat," as an officer edged within inches of him, attempting to search him. *Id*. at 1:36. The officer who initially approached Mr. Green declared "I'm about to do a pat down," and then started reaching into Mr. Green's open coat while another officer held him from behind. *Id*.

---

[2] The minute markers refer to the timestamp that elapses on the video player, not the watermarked timestamps on the recording.

at 1:38. All the while, Mr. Green protested that "yo, y'all cannot search me, pat me down like that." *Id.* at 1:41.

Footage from the body cameras of several officers shows the initial encounter, seizure, and search of Mr. Green from several perspectives.















Later, in a probable cause affidavit, Detective Rondon, who approached, seized, and searched Mr. Green wrote:

> Your writer (Det. Rondon- front passenger) and Det. Coss y Leon (driver) were conducting patrol in the 5100 block of park heights while operating a marked BPD vehicle equipped with lights and sirens[.] Based on my training, knowledge and experience I know this area to be a violent crime and open-air drug market area. This area suffers from extensive violence to include; robberies, assaults, non-fatal shootings, homicides and individuals armed with firearms. This area also receives numerous calls for service for CDS related offenses. While conducting patrol, detectives observed a black male wearing a white coat and gray sweatpants, later identified as Mr. Kanye Green, standing in the 5100 block of Park Heights Avenue. Your writer observed a heavy object located on the left side of Mr. Green's coat, which caused the coat to hang unevenly and created an abnormal bulge. Based on my training and experience, I know that the weight of a firearm can cause unnatural displacement in clothing such as jackets or coats. Detectives stopped their patrol vehicle to further make observation of Mr. Green. Upon seeing our marked BPD vehicle Mr. Green turned the left side of his body from your writer[‘s] view and pinned his left arm towards to side. Based on your writer[‘s] training, knowledge and experience, Mr. Green conducted what is known to your writer as “blading” his body. This act is done to obstruct the view of law enforcement from seeing the imprint/bugle (sic) of a possible firearm. As Mr. Green started to walk away, your writer observed Mr. Green quickly used his left arm to gasp (*sic*) the heavy object and pulled up in a upwards motion. Through my training, knowledge and experience I know this to be called a “security check” which is a characteristic of an armed person assuring the firearm is still in place. At this time, Det. Coss y Leon and your writer believed

> Mr. Green was armed with an firearm. Det. Coss y Leon relayed this information to Det. Lopez and Det. Gonzalez to assist with weapons pat-down. Your writer exited the marked patrol vehicle and asked Mr. Green if he had a firearm on his person ln his he stated "no", and lift up his jacket with out (*sic*) being asked. Your writer informed Mr. Green he didn't have to do that and I asked about inside the coat. Mr. Green then turned his body away (blading) from your writer and began to unzipping the coat 3/4 of the way, while quickly using his left hand to touch the left jacket pocket. Mr. Green stated he only had weed on his person and pulled it out from inside his coat. At this time det. Coss y Leon was able to briefly see the black handle of the firearm from inside the coat pocket. Your writer retrieved black Ruger SR9 (serial number 33082028) loaded with 8 live 9mm rounds(one chambered). Your writer rendered the firearm safe. Recovered from Mr. Green's person were a 1 clear plastic bag containing 14 red top vials containing white rock substance (suspected crack cocaine), 12 pink top vials containing white rock Substance (suspected cocaine), 3 white top vials containing white rock substance (suspected cocaine), 1 clear plastic baggie containing 3 blue top vial containing white Rock substance (suspected cocaine), 1 pink top vials containing white rock substance (suspected cocaine), 3 small clear plastic baggie containing white rock substance (suspected cocaine), 1 multi-colored designer bag containing green leafy substance (suspected cannabis) and 9 multi-colored designer bag containing green leafy substance (suspected cannabis).

Baltimore Police Officer Kendis Rondon, Statement of Probable Cause (Oct. 28, 2025) (typographical errors appear in the original affidavit).[3]

---

[3] Mr. Green does not stipulate to the veracity of these allegations and reserves the right to challenge them at trial or any other hearing.

## Argument

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure not based on reasonable suspicion is illegal. *United States v. Wilson*, 953 F.2d 116, 120 (4th Cir. 1991). And when the "illegality of the seizure infect[s] the search…the evidence must be suppressed." *Id.* Thus, the government must show that either Mr. Green was not seized for purposes of the Fourth Amendment when officers located a gun on his person, or alternatively, that they had reasonable suspicion to seize and search him. They cannot meet their burden on either claim.

### I. A Seizure Occurs When a Reasonable Person Would Feel Compelled to Submit to a Show of Authority, and so, the Government Must Establish Reasonable Suspicion at that Point in the Encounter.

A seizure occurs when an officer "by means of physical force or show of authority, has in some way restrained [a person's] liberty." *See United States v. Bowman*, 884 F.3d 200, 211 (2018) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The inquiry is based on the totality of the circumstances and asks whether "a reasonable person in the suspect's position 'would have felt free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* (quoting *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998)).

"Examples of circumstances that might indicate a seizure…would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United*

*States v. Mendenhall*, 446 U.S. 544, 555 (1980). Additionally, the Fourth Circuit considers "any attempt to physically block [a defendant's] departure or restrain his movement" and "whether the officers informed the defendant that they suspected him of 'illegal activity rather than treating the encounter as 'routine' in nature." *See United States v. Black*, 707 F.3d 531, 537-538 (4th Cir. 2013); *United States v. Jones*, 678 F.3d 293, 300 (4th Cir. 2012). A routine encounter is one where officers ask to speak with an individual, patiently await responses, engage the individual in conversation, and explain their purpose. *Jones*, 678 F.3d at 300.

A person's "submission to the assertion of authority" is a critical factor in determining whether a seizure has occurred. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). But submitting to authority does not create reasonable suspicion or probable cause for a search, because a person may always terminate an encounter based on anything less than reasonable suspicion. *See United States v. Black*, 707 F.3d 531 (4th Cir. 2013)(suppressing firearm found by officer on an individual who was part of a group of six men approached by uniformed officers while standing outside a convenience store, even after some members of that group were frisked and provided identifying information, because officers blocked the individual's path when he chose to leave); *United States v. Wilson*, 953 F.2d 116 (4th Cir. 1991)(suppressing drugs found by officers on an individual arriving on a flight from New York City even though he had consented to questioning and allowed a search of his luggage and person, because he asked to terminate the encounter before officers searched an additional coat).

While law enforcement has the limited right to stop and frisk individuals upon a reasonable suspicion that a crime is afoot, that suspicion must be based on articulable facts and not a mere hunch. *See Terry v. Ohio,* 392 U.S. at 22. In seeking to establish reasonable suspicion, "[t]he government cannot simply proffer whatever facts are present, no matter how innocent, as indicia of suspicious activity." *United States v. Massenburg*, 654 F.3d 480, 489 (4th Cir. 2011) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). Nervous behavior, stepping back from officers, and saying "I don't need to get a pat-down" is not sufficient for reasonable suspicion. *Id.* at 489.

Nor does a bulge, appearing under a jacket from fifteen feet away, create reasonable suspicion. *See, e.g., United States v. Grant*, No. 4:11cr20, 2011 U.S.Dist. LEXIS 165396, at *27 n.5 (E.D. Va. Aug. 5, 2011)(rejecting officer's testimony that he "'observe[d] what appeared to be the outline of the top of the gun' and '[i]t appeared to me that the barrel was facing down…the top of the barrel would be facing down to the bottom of the pocket and you could see the outline, a flat outline that would indicate to me that there was possibly a firearm in that pocket.'," as nothing more than a hunch.) The same is true for ambiguous motions. *See United States v. Jones*, 2018 WL 1582217 (E.D.N.Y. Mar. 29, 2018) ("Even if the Court were to credit the officers' statements, there are myriad innocent explanations as to why Defendant may have been adjusting his waistband."); *United States v. Dupree*, No. RDB-13-0256, 2013 WL 4499037 at *1 (D. Md. Aug. 20, 2013) (Bennett, J.) (finding no reasonable suspicion where law enforcement observed several purported "characteristics of an

armed person," including an "angular bulge in the dip' of the Defendant's right side," several "security checks," and "stiff" walking).

Indeed, even an officer's certitude that an individual has a firearm is alone insufficient for reasonable suspicion—given that it is lawful to wear, carry, or transport a handgun in Maryland if one has a permit to do so. *See* Md. Code, Crim. Law § 4-203(b)(2); *Black*, 707 F.3d at 540 ("Being a felon in possession of a firearm is not the default status…where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention.")

## II. Officers Seized Mr. Green Absent Reasonable Suspicion, and then, Illegally Searched Him.

In this case, there is no question that officers made a show of force as they approached Mr. Green and that he submitted to their authority. As Detective Rondon approached Mr. Green, asking whether he had a gun, police vehicles began to surround Mr. Green. Mr. Green, recognizing this show of force, immediately lifted his coat in a gesture responsive to Detective Rondon's question. Another officer came within inches of Mr. Green, preventing him from walking away—even as Mr. Green verbally protested the legality of the encounter. Before engaging Mr. Green in this way, officers had no particularized information that crime had occurred or was afoot.

## Conclusion

For the foregoing reasons, Mr. Green respectfully requests that the Court suppress all items found resulting from the government's unlawful seizure and subsequent search of his person.

Respectfully submitted,
James Wyda
Federal Public Defender
for the District of Maryland

/s/

Gabriel Reyes
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email: gabriel_reyes@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2026, a copy of the foregoing was served via CM/ECF to the Government.

_______/s/________
Gabriel Reyes