**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, 9th FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-3976
EMAIL: gabriel_reyes@fd.org

JAMES WYDA
FEDERAL PUBLIC DEFENDER

GABRIEL REYES & JESSICA SAWADOGO
ASSISTANT FEDERAL PUBLIC DEFENDERS

August 11, 2026

The Honorable Judge Deborah K. Chasanow
United States District Court for the District of Maryland
101 W. Lombard St.
Baltimore, MD 21201

**VIA CM/ECF**

**Re: *United States v. Kanye Green,* 1:26-cr-00093-DKC**

Dear Judge Chasanow:

We write briefly to supplement our argument following the August 4, 2026, hearing on Defense's Motion to Suppress, ECF No. 27.

First, we write to draw the Court's attention to *United States v. Williams*, 180 F.4th 613 (4th Cir. 2026) to support the assertion that Mr. Green was seized from the moment the two patrol cars and Detective Rondon surrounded him. In *Williams*, the Fourth Circuit held that an individual is seized when "'blocked in' by police cars because a reasonable person would not [feel] free to attempt his available means to exit." *Id.* at 624. Like the defendant in *Williams*, Mr. Green was blocked in and therefore seized, because he was descended upon by a patrol car to his left and right, with his back against the wall, while another officer walked directly at him.

Second, we assert that it is irrelevant that Detective Coss Y Leon allegedly saw a barrel of a handgun in Mr. Green's jacket because he did not communicate that information to Detective Rondon, who conducted a pat down of Mr. Green absent reasonable articulable suspicion. Under the Fourth Circuit's collective knowledge doctrine, the officer who decides to perform a search cannot use uncommunicated information known by another officer to justify that search ex-post facto.

Finally, we seek to correct the government's erroneous assertion that it is "illegal to possess a firearm and marijuana in Maryland." Ex. 1, Mot. Hr'g Tr., at p. 74. There is no law prohibiting the simple, simultaneous possession of a personal use amount of marijuana and a firearm. As such, officers had no reasonable articulable suspicion to stop Mr. Green (or

probable cause to arrest him) simply because he possessed a sealed, personal use amount of marijuana and officers suspected he also possessed a firearm.

In short, Mr. Green's search and seizure violated the Fourth Amendment. All fruits of the illegal search and seizure must be suppressed.

**I. Mr. Green was unlawfully seized from the moment officers surrounded him, which occurred as Detective Rondon exited his vehicle but before Mr. Green lifted his jacket.**

Mr. Green was seized at the moment two police cars encircled him, while another officer approached him and asked him questions with an authoritative tone. As the screenshots from the bodyworn camera exhibits make clear, the police cars and Detective Rondon (on foot) descended upon Mr. Green simultaneously. First, Detective Rondon and Detective Coss Y Leon drove by Mr. Green on Park Heights Avenue. Next, Detective Rondon got out of his vehicle at 17:44:43 p.m.




*Detective Rondon exits the police vehicle at 17:44:43 p.m. Ex. 3, Detective Rondon's Bodyworn Camera.*

While Detective Rondon got out of the vehicle, Mr. Green's body was turned toward the other police vehicle, which had started to drive toward Mr. Green.




*Mr. Green stands facing the police car at 17:44:48 p.m. The lights of the car are activated, and the window is rolled down, revealing the driver to be a police officer. Ex. 3, Detective Rondon's Bodyworn Camera.*

At the August 4, 2026 motion hearing, the Court inquired whether Mr. Green would have seen and recognized the second police car during his stop. Ex. 1 at pp. 85-86. At the hearing, defense counsel expressed uncertainty on this question. Upon closer review of the video, however, it is clear that Mr. Green would have recognized the car as a police vehicle. Although the car was unmarked, it was in Mr. Green's line of sight as it turned toward him, and the car's window was partially rolled down, revealing that an officer wearing police uniform was driving the vehicle. In addition, the car had a large computer device on the dashboard area, which is indicative of law enforcement. The unmarked car was impeding the flow of traffic, further signaling that this was not a civilian car, but was part of a coordinated police effort to stop Mr. Green.




*At 17:44:48 p.m., the bodyworn camera from the officer driving the unmarked police car (Detective Israel Lopez) shows that the driver's side window was rolled down, and that the car had a partially open laptop by the dashboard, as is typical of police cars. Ex. 4, Detective Israel Lopez's Bodyworn Camera.*

While the unmarked car blocked the flow of traffic and moved closer to Mr. Green, Detective Rondon began to interrogate him. In response, Mr. Green moved to lift up his jacket at 17:44:55 p.m. The unmarked car that Mr. Green had already noticed was moving closer to surround him.




*Mr. Green moved to lift up his jacket at 17:44:55 p.m. The police car in the frame moves closer to him as it blocks the car behind it from moving forward. Ex. 3, Detective Rondon's Bodyworn Camera.*

At the same time, Detective Coss Y Leon's bodyworn camera shows that he had started his U-Turn to drive his car, which was already close to Mr. Green, to be front-facing.




*Detective Coss Y Leon turns the wheel of his vehicle to drive toward Mr. Green after Detective Rondon has exited the car at 17:44:47 p.m. Ex. 2, Bodyworn Camera of Detective Coss Y Leon.*

The Fourth Circuit's decision in *United States v. Williams*, 180 F.4th 613 (4th Cir. 2026) explains why Mr. Green was seized at the moment officers blocked him in. In *Williams*, the Court found that the presence of several police cars who stopped their cars in "the middle roadway" "inherently sent a message of seizure" to the defendant, as these factors, among others, "would indicate to a reasonable person that he was the subject of police investigation and therefore not free to leave." *Id.* at 624.

The same is true here. Mr. Green was encircled by two police cars while a third officer, wearing a tactical vest and armed with a gun, Ex. 1 at p. 10, walked toward him. Mr. Green saw both cars and would have recognized them as police cars, as one was marked, and the unmarked police car had its window rolled down and the officer was plainly visible. As the one officer on foot approached, he began questioning Mr. Green in an aggressive tone. While he asked questions, the two police cars drove closer to Mr. Green, impeding the flow of traffic, and "inherently sen[ding] a message of seizure." The marked police car quickly made a U-turn in the middle of the roadway and pulled even closer to Mr. Green. Mr. Green was therefore seized at the moment the cars and Detective Rondon descended upon him and blocked him in, which occurred before Mr. Green lifted his jacket.

## II. The collective knowledge doctrine did not permit Detective Rondon to pat down Mr. Green.

Detective Rondon testified that he patted Mr. Green down because he observed a "stiff arm, the blading of the body, and the security check." Ex. 1 at p. 42; *see also id.* at p. 20. Though asked about his justifications several times at the hearing, Detective Rondon *never testified* that he conducted the pat down because he knew there was a barrel of a handgun in Mr. Green's jacket. Moreover, Detective Coss Y Leon also testified that he intentionally did not tell Detective Rondon that Mr. Green had a gun because he did not want to cause a scene. *Id.* at p. 54. Under the Fourth Circuit's view of the collective knowledge doctrine, Detective Coss Y Leon's alleged observation cannot be used to justify Detective Rondon's warrantless search, because Detective Rondon did not have that knowledge at the time he decided to conduct the pat down. *United States v. Massenberg*, 654 F.3d 480, 492 (4th Cir. 2011). Indeed, Detective Rondon's search (as he testified) was based on Mr. Green's alleged "evasive" body movements and his presence in a "high-crime area"—factors that are wholly insufficient to justify a warrantless search. Ex. 1 at pp. 41-42.

The Fourth Circuit is clear that "[i]nformation gleaned from another officer on the scene that is 'not known' to the acting officer at the time of the search is 'irrelevant' for purposes of Fourth Amendment reasonable suspicion analysis." *United States v. Carson*, 180 F.4th 650, 662 (4th Cir. 2026) (Berner, J., concurring). Indeed, in *Massenberg*, the Court declined to find that one officer could rely on a second officer's observation of bulge in a suspect's jacket because the second officer never communicated his observation to the first officer. *Id.* at 495-96. The Fourth Circuit warned that allowing police to justify a frisk by relying on uncommunicated information would "seriously erode the efficacy of the exclusionary rule's deterrent purposes." *Id.* at 495. The court therefore declined to view the knowledge of all officers on the scene as collective where it was not communicated to the searching officer.

The same should be true here: Detection Rondon and Detective Coss Y Leon's knowledge must be viewed separately because Detective Coss Y Leon did not testify that he specifically told Detective Rondon that Mr. Green had a gun. Indeed, when asked about his justifications for conducting a pat down of Mr. Green, Detective Rondon articulated his personal observations about Mr. Green's behavior. Ex. 1 at pp. 19, 20, 42. Though he testified that Detective Coss Y Leon instructed him to perform a pat down, at no time did Detective Rondon testify that Detective Coss Y Leon told him he had seen the barrel of a gun. *Id.* at p. 19. Moreover, when asked what the reasonable articulable suspicion he believed he had in order to conduct the pat down, Detective Rondon cited only "[t]he characteristics of an armed person, the security check, the stiff arm, and the blading of the body." *Id.* at 19. He did not cite knowledge that Detective Coss Y Leon had seen the barrel of a gun.

Detective Coss Y Leon testified that he had "alerted…Detective Rondon…to conduct a pat-down." *Id.* at p. 54. But Detective Coss Y Leon did not explain what this "alert" consisted of or what words, if any, he used to communicate with Detective Rondon. In any event, this "alert" was not captured by any of the bodyworn camera, even though the cameras did capture other statements the officers made. For example, Detective Coss Y Leon's bodyworn camera, Detective Rondon can be heard stating that he was "about to do a patdown." Ex. 2 at 17:45:22 p.m. Detective Coss Y Leon then asked Mr. Green if he "has anything on [him]." *Id.* Notably, Detective Coss Y Leon also admitted that he did not hear himself informing Detective Rondon that he saw on gun in Mr. Green's jacket on review of his bodyworn camera. Ex. 1 at p. 62. ("Did you hear yourself say "do the pat?" "I guess the camera didn't catch it."). The Court should therefore decline to impute Detective Coss Y Leon's observation of a gun barrel onto Detective Rondon.

Thus, there is no evidence to support that Detective Rondon knew Detective Coss Y Leon had seen a barrel of a gun in Mr. Green's jacket. And where another officer's knowledge has not been communicated to the officer conducting the search, it cannot be used to justify that search in the aggregate.

## III. Simultaneous possession of a personal use amount of marijuana and a firearm is not illegal in Maryland.

Even if the Court finds that Mr. Green was not seized until the moment the frisk began, suppression is still required because (1) all parties agree that Mr. Green was seized as of the moment that the frisk began, and (2) at the time of the frisk, there was no reasonable suspicion of a crime since, contrary to the government's position, it is not a crime in Maryland to possess a gun and marijuana simultaneously.

In its brief and at the hearing, the government asserted that officers had probable cause to arrest Mr. Green because he possessed marijuana and officers suspected he also possessed a firearm. ECF No. 43 (Government's Opposition to Motion to Suppress) at 15-16 (arguing that officers would have had probable cause to arrest Mr. Green because "Maryland law makes it clear that legal gun owners are prohibited from possessing [m]arijuana"); Ex. 1 at p. 74 ("Maryland law makes it clear that legal gun owners are prohibited from possessing marijuana."). This assertion has no basis in Maryland law. Defense counsel has made a good faith effort to identify a Maryland law that prohibits the possession of a personal use amount of marijuana while also possessing a firearm, but it appears that no such statute exists.

Maryland law does prohibit certain individuals from possessing a regulated firearm, including anyone who is "addicted to or a habitual user of a controlled dangerous substance." Md. Code Ann., Pub. Safety § 5-133(b)(7) (2025). The Public Safety Article defines a "habitual user" as "a person who has been found guilty of two controlled dangerous substance crimes, one of which occurred in the past 5 years." *Id.* § 5-101(m). The officers did not testify that they knew, or believed, Mr. Green had any past convictions for drug crimes. Accordingly, the officers lacked any basis to conclude Mr. Green fell within Maryland's definition of a "habitual user."

The defense focuses on state law because the arresting officers did not have the authority to make an arrest under federal law. *See* ECF No. 44 (Reply to Government's Opposition) at 11-12. Nonetheless, the argument is equally applicable when applied to federal law. Under the federal law corollary, 18 U.S.C. § 922(g)(3), a person is prohibited from legally owning a weapon if the person "is an unlawful user of or addicted to any controlled substance." A person qualifies as an unlawful user only if his drug use is "*consistent*, *prolonged*, and close in time to his firearm possession." *United States v. Hasson*, 26 F.4th 610, 615 (4th Cir. 2022) (emphasis added). An addict is "any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction." 21 U.S.C. § 802(a). Police were not aware of any facts suggesting Mr. Green satisfied these definitions.

Thus, officers did not have probable cause to arrest Mr. Green, and without probable cause, they lacked a legal basis to conduct a search incident to arrest. Nor did the officers have reasonable suspicion that Mr. Green was involved in criminal activity. Since the officers had no reason whatsoever to believe he met the "habitual user" definition, they necessarily lacked reasonable suspicion of that crime. And therefore, they could not detain and question him on that basis.

Ultimately, officers had no reasonable suspicion or probable cause of *any* crime involving Mr. Green. For example, officers did not have reasonable suspicion or probable cause of simple possession of marijuana, since that is not a crime (or even a civil offense) in Maryland. *See Moore v. Maryland Hemp Coal.*, 343 A.3d 624, 639 & n.7 (Md. Ct. App. 2025) (citing CL §§ 5-101(u), 5-601(a)(1)(ii)). And the officers also did not have reasonable suspicion or probable cause to believe Mr. Green was committing the offense of illegally possessing a handgun, because police can no longer simply assume that someone who has a gun in public lacks a permit. *See, e.g.*, *Hicks v. Maryland*, No. 634, 2026 WL 1601794, at *15 (Md. App. Ct. June 4, 2026) ("After *Bruen*, carrying a handgun publicly for self-defense is presumptively lawful.").

In short, the officers began the frisk without either reasonable suspicion or probable cause of *any* crime, which means the search was illegal and all evidence must be suppressed.

Sincerely,
/s/
Gabriel Reyes
Jessica Sawadogo
Assistant Federal Public Defenders