IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Criminal No. DKC 26-93 |
| KANYE GREEN | : | |

**MEMORANDUM OPINION**

Kanye Green is charged in a three-count indictment with possession of a firearm and ammunition by the respondent of a domestic violence protective order in violation of 18 U.S.C. § 922(g)(8); possession with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 841(a)(1); and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). These charges arise from an encounter between Mr. Green and law enforcement on October 28, 2025. He has moved to suppress the items seized during that encounter, contending that all proceeded from an unconstitutional stop without reasonable suspicion.

On October 28, 2025, at about 5:40 p.m., Detectives Kendis Rondon and Tyler Coss Y Leon were patrolling the 5100 block of Park Heights Avenue in Baltimore City. They were members of the Baltimore City Police Department NW District Action Team and their job was, proactively, to look for persons possibly involved in

criminal activity, in order to intercede before any violence occurred. The area was known to the police as a "high crime area" including open air drug markets and violent crime. From their marked police SUV, the officers came up to Kanye Green who was walking alone down the wide sidewalk, in the same direction they were driving, and somewhere in the middle of the block. Thus, Mr. Green was to their right with his left side closest to the police officers. Detective Rondon, the passenger, saw that Mr. Green's puffy jacket was lopsided—the left side looked like there was a heavy object in the pocket, too heavy to be a phone or keys. Both officers saw when Mr. Green noticed their police vehicle. He turned around and started walking in the other direction, so that his left side was away from the officers, held his left arm stiffly against his left side, and appeared to check for the security of the object in the left pocket.

The detectives decided to investigate further. Det. Rondon got out of the SUV and started walking toward Mr. Green at a normal pace. Mr. Green was still on the sidewalk but now somewhat away and near an intersection. It took Det. Rondon 8 to 10 seconds to get near to Mr. Green to engage in direct conversation. On the way there, he gave Mr. Green his name, asked how he was doing, and asked if Mr. Green had a firearm. Mr. Green said, "no" and lifted his jacket up so that his waistband could be seen. There was no

weapon there. Meanwhile, Det. Coss y Leon turned the SUV around and came to a stop near the curb where Mr. Green and Det. Rondon were standing. As Det. Coss y Leon got out, Mr. Green was still talking to Det. Rondon although Mr. Green was turning his body to his left and away from Det. Rondon. Mr. Green said that he only had some “weed” on him and that he was 21. As Det. Coss y Leon went closer, Mr. Green pulled out a green commercial package of marijuana. Det. Coss y Leon was close enough to Mr. Green at that point to see into the left pocket of the jacket and saw the backside handle of a firearm. He gave an instruction to Det. Rondon to do a pat down; a firearm was found in the pocket. Mr. Green was arrested and a search incident to arrest revealed cannabis, cocaine, crack cocaine, and some currency.

The evidence from which those facts are drawn consists of the testimony of the two detectives and video recorded by their body worn cameras. Both detectives testified that they believed that Mr. Green possessed a firearm in his jacket pocket based on his conduct when he saw them, blading (turning away), stiff arming the left side, and conducting a “security check,” using his hand to make sure the unholstered firearm didn’t fall out. Det. Rondon had also seen that an object was in the pocket that seemed heavier than a wallet or cell phone, based on what he said was a lopsided tilt to the jacket. He did not describe the size or shape of any

bulge. Det. Rondon testified that, when Mr. Green denied having a firearm, Det. Rondon thought he was lying and also inferred that Mr. Green did not have a permit to carry a firearm. He made that deduction because he said that a person who carried a firearm with a permit would have admitted having the firearm and would have said he had a permit, which he would have been required to carry with him. Both detectives testified that it was illegal to have both a firearm and marijuana at the same time.

Mr. Green contends that his encounter with the detectives was a *Terry* stop from the inception, that there was no reasonable articulable suspicion at that time, and that everything that followed remained unconstitutional. The Government asserts that the interaction was not a *Terry* stop until Det. Coss y Leon directed Det. Rondon to conduct a frisk and that, by that time certainly there was reasonable suspicion that Mr. Green illegally possessed a firearm, justifying both the stop and the frisk.

Not every contact between a law enforcement officer and another person implicates protections of the Fourth Amendment. A police officer may approach an individual on a public street to ask if the person is willing to answer questions, and put questions to a person who is willing to listen, without violating the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 497 (1983). A person must be “seized” before there is any necessity for justification.

A seizure occurs "only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id*. at 554.

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See *Terry v. Ohio*, [392 U.S. 1,] 19, n. 16, (1968)]; *Dunaway v. New York*, 442 U.S. 200, 207, and n. 6 [(1979)]; 3 W. LaFave, Search and Seizure 53–55 (1978).

*Mendenhall*, 446 U.S. at 554–55 (footnote omitted). Furthermore,

> whether a reasonable person would have felt free to leave requires a holistic analysis of the totality of the circumstances of the encounter, *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870; [*United States v*.] *Jones*, 678 F.3d [293,] 299 [(4th Cir. 2012)] (quoting [*Florida v.*] *Bostick*, 501 U.S. [429,] 439 [(1991)]). Our cases have enumerated six broad, non-exclusive categories of facts that may be relevant: (1) how many officers were present; (2) whether officers were in uniform and/or displayed firearms; (3) whether any officer

> touched the defendant or made any attempt to block or restrain his movement; (4) if the officer's questioning was "'conversational' rather than 'intimidating'"; (5) whether the officer informed the defendant that he suspected him of illegal activity, or treated the encounter as "routine"; and (6) if the officer asked for identification, how quickly the officer returned it to the defendant. *United States v. Gray*, 883 F.2d 320, 322–23 (4th Cir. 1989); *see also, e.g.*, *Jones*, 678 F.3d at 299–300.

*United States v. Cloud*, 994 F.3d 233, 242–43 (4th Cir. 2021).

Det. Rondon was on foot when he first spoke to Mr. Green who was also on foot, several yards away. Det. Rondon was wearing a vest identifying him as a police officer and he had a weapon, but it was not drawn. The marked vehicle was probably visible to Mr. Green as it turned and parked at the curb. Det. Coss y Leon did not get out of the car until all of the relevant information had been spoken by Mr. Green, *i.e.*, no, he didn't have a gun, only marijuana. No one asked him to lift his jacket or produce the marijuana. The unmarked cruiser stopped in the intersection, even if identifiable as a police vehicle, was not near the sidewalk on which Mr. Green stood. That officer did not get out of the vehicle.

When Det. Rondon approached Mr. Green and asked him questions, it remained a consensual police-citizen encounter. Mr. Green could have declined to talk and walked away. The area behind and to his left was a wide sidewalk at a corner and provided a clear avenue to leave. So was the sidewalk that Mr. Green had just

traversed. Det. Coss y Leon testified that he stayed in his SUV for a bit to see if Mr. Green stayed or left (fled) so that he could follow and "keep eyes on him" if he left. That indicates that a path was clear. These circumstances are far different than those in *United States v. Williams*, 180 F.4th 613 (4th Cir. 2026), cited by Mr. Green in his supplemental brief. *Williams* involved a vehicle and the question of whether it was blocked in by a police vehicle parked in the middle of the roadway. *Id.* at 624. The court stated: "A vehicle may be considered blocked in even if it is not completely restrained." *Id.* at 622. Certainly, parking in the middle of the roadway, rather than against a curb or in a marked space in a parking lot, was an appropriate circumstance to consider in that case. Here, the unmarked car stopped in the intersection and seemed to be blocking vehicular traffic, but it was not parked to block in pedestrians such as Mr. Green, and the officer remained in that car.

Considering all of the circumstances, Mr. Green was not seized when Det. Rondon approached on foot. Only one officer approached him slowly, armed but not displaying the weapon, and greeted him in a conversational tone. While he inquired about the possession of a firearm, it was not in accusatory language. Det. Coss y Leon was in the marked vehicle and pulled up alongside, facing the wrong way on the street. He did not initially get out and said nothing.

The unmarked cruiser pulled into the intersection, but stayed away from the sidewalk and curb where Mr. Green was standing. There remained ample room for Mr. Green to turn and walk away. This encounter did not ripen into a stop just because of the presence of the two police cars.

Mr. Green argues that, as a young Black man, he reasonably felt unable to walk away—to do so risked injury from the police. Counsel even described his own advice to persons who are stopped while driving: put your hands on the steering wheel and don't move, comply with instructions from law enforcement. He cites to *Washington v. State*, 482 Md. 395, 433-34 (2022)("the circumstance that unprovoked flight may be consistent with innocence is a factor that a court may take into account in determining whether officers had reasonable suspicion to detain a person, particularly a young African American man, such as Washington. In other words, the circumstance that people, particularly young African American men, may flee police for innocent reasons may be considered in the Fourth Amendment reasonable suspicion calculus."); and *United States v. Brinkley*, 980 F.3d 377, 391 (4th Cir. 2020)("Recent events have underscored how quickly police encounters with Black Americans may escalate, at times fatally."). As noted, a court is to take all circumstances into account in determining whether the encounter has escalated into a Fourth Amendment seizure, and Mr.

Green's own conduct must be assessed in light of the history noted in those cases. But here, it is his affirmative behavior in holding his arm in a certain way and displaying his waistband and the marijuana, not flight, or nervousness, that is relevant.

Mr. Green stayed and answered Det. Rondon both verbally and through conduct. He said no when asked if he had a firearm, and lifted his jacket, unbidden. An officer then asked him if he had anything on him and he said only some weed. He then pulled out a green package of marijuana. Det. Coss y Leon got out of his marked police car. He, too, wore a vest identifying himself as a police officer and wore his firearm. Even then, this encounter was not a seizure.

The encounter ripened into a *Terry* stop when Det. Coss y Leon got close to Mr. Green as he was displaying the marijuana package. At that point, as shown in the body worn camera, the detective was so close that a reasonable person would not have felt he could leave.

Once it is determined that a stop has occurred, the court must assess whether there was reasonable suspicion justifying the stop.

The defense contends that the reset on presumptions prompted by the decision of the Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen* 597 U.S. 1 (2022), dooms the stop and frisk in this

case. It argues that the behavior in this case was not sufficient for the officers to suspect reasonably that he was armed, and, moreover, that any possession was illegal. The undersigned disagrees. First, the officers were trained to recognize behavior of armed persons and ably described what they saw (which was before the body worn cameras were activated.) The combination of observations, heavy object, turning away upon seeing the police, holding arm stiffly and to protect the heavy object, and nature of the neighborhood, was sufficient for the officers to suspect reasonably that Mr. Green was armed and to decide to investigate further. It is not proper to focus, myopically, on each factor separate from all the others.

> Nonetheless, we still must consider all of the factors together, given that "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation." [*United States v.*] *McCoy*, 513 F.3d [405,] 413–14 [(4th Cir. 2008)]. This court "must look at the cumulative information available to the officer," rather than hold a "stop unjustified based merely on a piecemeal refutation of each individual fact and inference." [*United States v.*] *Branch*, 537 F.3d [328,] 337 [(4th Cir. 2008)] (internal quotation marks omitted).

*United States v. Bowman*, 884 F.3d 200, 218 (4th Cir. 2018).[1]

[1] The defense cites two state court decisions, *Hicks v. State*, 270 Md.App. 174 (2026) and *Robinson v. State*, 2025 WL 1982852 (Md.App.Ct. July 17, 2025), as well as a handful of federal cases discussing reasonable suspicion and firearm possession. While it

Based on the body worn camera recordings, made after the police approached Mr. Green, the defense challenges Det. Rondon's testimony that the jacket was askew, with the left side seeming to have a heavy object that weighed it down. The body worn camera recordings do not capture Mr. Green when the detectives first saw him from their vehicle, or during the time he walked from the middle of the block after he turned around and walked back toward the intersection, during which he could have adjusted the weight. When the video does depict Mr. Green, his hands are in his pockets and his arms partially obstruct the sides of the jacket. The video does not conclusively refute the description that Det. Rondon gave of seeing something askew and the undersigned credits that testimony. When coupled with what both detectives said Mr. Green did upon seeing them, indicative based on their training and experience of a person trying to secure and conceal a firearm, they reasonably concluded that the object he was protecting was a firearm.

Still, they did not immediately conduct a *Terry* stop. Rather, they continued their observations, one of them approached Mr. Green to engage him in conversation and asked if he had a weapon. He

is helpful to read those cases, each case must be evaluated on its own facts and, as noted above, the totality of circumstances determines whether there is reasonable suspicion.

denied that he did and said he only had "weed" that he then displayed to the officer.

The question becomes whether the combination of circumstances known to the officers at the time the marijuana package was shown produces reasonable suspicion of illegal gun possession: a person reasonably suspected to have a gun, but lies about it so that a police officer believes that he doesn't have a permit, and is in possession of marijuana.

> Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the officer] to determine whether he thought that the facts constituted reasonable suspicion. *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998). Additionally, it must be noted that, because the *Terry* reasonable suspicion standard is a commonsensical proposition, "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

*United States v. Foreman*, 369 F.3d 776, 781–82 (4th Cir. 2004).

At a minimum, as a non-law enforcement officer, a person must have a permit to possess a concealed firearm on a public street in Baltimore. Md. Code Ann., Crim. Law Section 4-203(a), (b)(2) (West 2026). And, a person is supposed to carry the permit so that it can be displayed when requested. *Id.*, Pub. Safety Section 5-308. While this would be a simpler case if Det. Rondon had asked

outright about the permit/license, he testified, candidly and believably, that he didn’t ask because he inferred that Mr. Green had no permit by his prevarication about even having a firearm. He said that, in his experience, if a person had a firearm and was licensed, the response to his question about possession of a firearm would have been different. Thus, there is an articulable basis for Det. Rendon’s conclusion that Mr. Green lacked a permit.

Furthermore, at the time of this encounter, October 2025, both Maryland and federal law prohibited possession of a firearm by a user or habitual user of drugs. The Maryland definition of habitual user is: “a person who has been found guilty of two controlled dangerous substance crimes, one of which occurred in the past 5 years.” Md. Code. Ann., Pub. Safety Section 5-101 (West 2026). That’s obviously a difficult definition to apply during a street encounter and determining whether reasonable suspicion that one is a habitual user can flow from the mere possession of marijuana is questionable. But Maryland law also criminalizes, as a misdemeanor, the carrying or transporting of a handgun, even with a permit, while the person is under the influence of alcohol or drugs. *Id.* Section 5-314. Certainly, seeing Mr. Green with marijuana and reasonably suspecting that he has a firearm, with or without a license, provided reasonable suspicion that a crime was being committed and merited further investigation.

Federal law is broader concerning firearm possession and use of a controlled substance. Title 18 U.S.C. § 922(g)(3)[2] prohibits firearm possession by a person who is an unlawful user of a controlled substance:

> Admittedly, the legal contours of “unlawful user” of a controlled substance are not well defined within the statute. As an aid, this Circuit has used the test articulated in *United States v. Purdy*, 264 F.3d 809 (9th Cir. 2001), to determine whether a person can be thus characterized under § 922(g)(3). To convict someone under the statute (or, as here, enhance a sentence), *Purdy* requires that the government prove “that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm.” *Purdy*, 264 F.3d at 813. *See also United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002) (upholding § 922(g)(3) conviction where defendant admitted to using marijuana from childhood until two months before the offense); *United States v. Edwards*, 38 F.App’x 134, 138 (4th Cir. 2002) (unpublished) (stating that the drug use must be consistent, prolonged, and close in time to gun possession); *United States v. Sperling*, 400 F.App’x 765, 767 n.3 (4th Cir. 2010) (unpublished) (noting the Ninth Circuit's “persuasive” decision in *Purdy*).

*United States v. Claybrooks*, 90 F.4th 248, 253 (4th Cir. 2024).

[2] In *United States v. Hemani*, 608 U.S. ---, 146 S.Ct. 1677 (2026), the Supreme Court found that §922(g)(3) violated the Second Amendment as applied to Mr. Hemani. It did not address laws that banned addicts or “those presently intoxicated” from possessing firearms. 146 S.Ct. at 1693. Counsel for Mr. Green acknowledged that *Hemani* does not affect this case.

> Indeed, every circuit to address the issue, albeit mostly in a cursory fashion, has held that what renders someone an "*unlawful* user" turns on the legal status of the drug. The Fifth Circuit, for instance, recently defined "unlawful user" as "someone who uses *illegal* drugs regularly and in some temporal proximity to the gun possession." *United States v. Daniels*, 124 F.4th 967, 970–71 (5th Cir. 2025) (emphasis added). Similarly, the Ninth Circuit stated that "a common sense meaning" of the phrase "unlawful user" covered the defendant's regular use of heroin because heroin "has no legal use by laymen" and its use "by laymen is not permissible in any circumstance." [*United States v.*] *Ocegueda*, 564 F.2d [1363,] 1365 [(9th Cir. 1977)]. And both the Sixth and Seventh Circuits have adopted the ATF's definition of "unlawful user" as someone "who regularly ingests controlled substances in a manner except as prescribed by a physician." *United States v. Yancey*, 621 F.3d 681, 682 (7th Cir. 2010) (per curiam); *see United States v. Burchard*, 580 F.3d 341, 351 (6th Cir. 2009). Further, the Eighth Circuit has concluded the ATF's definition of "unlawful user"—as adopted by a district court in its jury instructions—was "entirely consistent with any standard for unlawful use to be gleaned from [its] prior decisions." *United States v. Turnbull*, 349 F.3d 558, 562 (8th Cir. 2003), *cert. granted, judgment vacated*, 543 U.S. 1099, 125 S.Ct. 1047, 160 L.Ed.2d 993 (2005), and opinion reinstated, 414 F.3d 942 (8th Cir. 2005). Although not controlling, these decisions from our sister circuits support our reading of the term.

*United States v. Davey*, 151 F.4th 1249, 1258 (10th Cir.), *cert. denied*, 146 S. Ct. 394, 223 L. Ed. 2d 211 (2025) (footnotes omitted).

> With respect to § 922(g)(3), the Fourth Circuit has explained that, "[t]o sustain a conviction, the government must prove that the defendant's drug use was 'sufficiently consistent, prolonged, and close in time to his gun possession to put him on notice that he qualified as an unlawful user' under the terms of the statute." *United States v. Sperling*, 400 F.App'x 765, 767 (4th Cir. 2010) (quoting []*Purdy*, 264 F.3d [at] 812 []).

*United States v. Costianes*, 673 F.Supp.3d 756, 758 (D.Md. 2023).

The Defense contends that federal law is irrelevant because these were not federal agents enforcing federal law, citing to out of circuit case law such as *United States v. Talley*, 467 F.Supp.3d 832 (N.D.Cal. 2020). That is not universally the case, however. Another California court said:

> State and local police generally are not precluded from enforcing federal law, *Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th Cir. 1983), overruled on other grounds by *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). Accordingly, state and local officials may make arrests for violations of federal criminal law where permitted to do so by state law. *Gonzales*, 722 F.2d at 475; *see also* 18 U.S.C. § [3041] ("For any offense against the United States, the offender may, ... by any chancellor, judge of a supreme or superior court, chief or first judge of the common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested....").

*United States v. Sapp*, 272 F.Supp.2d 897, 911 (N.D.Cal. 2003).

Broadly speaking, the question of whether the Fourth Amendment has been violated is resolved under federal law. *United*

*States v. Stephens*, 764 F.3d 327, 338 n.12 (4th Cir. 2014). And the question here is whether the exclusionary rule designed to deter future violations of the Fourth Amendment should be applied. At the time of this encounter and at present, the law on drug use and possession of firearms is in flux. As noted above, the presence of a firearm and marijuana, under the circumstances presented here, warranted further inquiry assisted by a *Terry* stop.

Here, of course, the question is not whether there was proof beyond a reasonable doubt at the time of the *Terry* stop. The inquiry is only whether the officers could have reasonable suspicion that the gun possession was illegal, either because of the lack of a permit or because of the presence of marijuana, or both. Both are supported on this record and the law as it existed at the time of this encounter. Accordingly, there was reasonable suspicion at the time the encounter ripened into a *Terry* stop.

The frisk was also permissible, given the reasonable belief that Mr. Green was armed with a hidden firearm, the fact that he possessed marijuana, and was in a "high crime" area, with other pedestrians present.[3] *See United States v. Robinson*, 846 F.3d 694,

[3] The video is somewhat unclear-and proceeds quite rapidly-as to the specifics of the frisk. The testimony was that Det. Coss y Leon saw the handle of the firearm and instructed Det. Rondon to conduct the frisk, which he did, felt the firearm, and removed it from Mr. Green's pocket. Observation of the handle of the firearm was not necessary to the justification of the frisk–

700 (4th Cir. 2017)(en banc). The discovery of the firearm was not the result of an unconstitutional search.

The defense does not challenge the arrest (except as a fruit of an unconstitutional stop) or the ensuing search incident that followed, meaning that the seizure of the other controlled substances was also not unconstitutional. Defendant's motion to suppress will be DENIED. A separate order will be entered.

/s/
DEBORAH K. CHASANOW
United States District Judge

---

the officers already had reasonable suspicion that Mr. Green had a firearm that he was anxious to conceal, that he was in possession of marijuana, that they thought he didn't have a license, and that he was on a public street known for drug trafficking and violent crime. They could have patted him down even if Det. Coss y Leon had not seen the handle. The fact that he saw the handle essentially means that the frisk was redundant.